United States District Court
District of Massachusetts

|  | ) |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. |
| HECTOR CABRAL, | ) | 12-10076-NMG |
| | ) | |
| Defendant. | ) | |
| | ) | |

MEMORANDUM & ORDER

GORTON, J.

A one-count superseding indictment charges defendant Hector Cabral ("Cabral") and three others with Conspiracy to Possess with Intent to Distribute and to Distribute Heroin, in violation of 21 U.S.C. § 846. Defendant's motions to suppress (Docket Nos. 84 and 85) were denied, in part, and allowed, in part, by a Court Order entered on April 9, 2013, "with memorandum and order to follow." The Court now publishes the subject memorandum and order. Also pending before the Court is the government's motion to strike defendant's affidavit submitted in support of suppression (Docket No. 110) which is addressed herein as well.

I.  Background

The charges against defendant stem from a DEA wiretap investigation in which an amount of US currency was seized following a traffic stop. The investigation revealed several

long standing drug trafficking organizations ("DTOs") operating in the Boston area.  Agents also learned that these DTOs obtained narcotics from an international cartel, members of which would transport narcotics to Boston via car or truck and then transport proceeds from the sale of those drugs out of Massachusetts.

The portion of the investigation relevant to the instant motion involves intercepted phone calls as well as GPS-monitored vehicles and physical surveillance.  On February 14, 2012 agents participating in a joint DEA-state police drug task force ("the joint task force") observed defendant meeting with an alleged co-conspirator, Bernardo Gomez, outside of a hotel where defendant was staying.  The following day, based upon wiretap recordings and location data, agents became aware that Gomez visited the home of another alleged co-conspirator, Ernesto Andujar, in order to pick up cash for the purpose of acquiring drugs from Illinois. Visual surveillance confirmed that Gomez exited Andujar's home carrying a weighted, tan plastic bag that same day.

On February 17, 2012, the date of the stop and search contested by defendant, agents in the joint task force witnessed Gomez hand a weighted, white plastic bag to defendant which defendant took into his hotel.  Agents then observed defendant and another individual, Marco Ledesma Benitez, come out of the hotel with their luggage.  Defendant put his luggage into his truck and appeared to stuff items into the dashboard area while

Benitez crawled underneath the vehicle with what appeared to be the white plastic bag.  The two then got into the vehicle, drove away from the hotel and onto an interstate highway.

Based upon those observations as well as intercepted communications and GPS data, the surveillance agents requested a uniformed Massachusetts State Police ("MSP") officer to stop defendant's vehicle.  Sergeant Charlie Kane, a detective also assigned to the joint task force, relayed these instructions to MSP Trooper Brian McKenna ("Trooper McKenna") and further informed him that the agents suspected that Cabral was transporting drug proceeds in "hides" behind the dashboard and underneath the vehicle.

Trooper McKenna stopped defendant's vehicle while traveling southbound on Interstate 95 near Foxborough, Massachusetts  at approximately 8 p.m.  Two other officers soon responded to the scene.  Trooper McKenna asked defendant to get out of the vehicle and patted him down.  He then asked defendant a series of questions related to the purpose of his travel while the two stood at the rear of Cabral's truck.  In substance, defendant responded that he was returning to Illinois after spending two weeks in Boston.

Trooper McKenna then asked Cabral if he was aware that the section of interstate on which he was traveling was a "drug corridor" and asked if defendant had any drugs, currency or

weapons in the vehicle.  Defendant denied that he was transporting any such items and, upon Trooper McKenna's request, purportedly agreed to a search of his vehicle.  Trooper McKenna then told defendant he would be using a narcotics detection dog during the search.  He also stated that the search would be brief and that, if they did not locate anything, defendant would be free to leave and continue on his way.  Defendant was then escorted to one of the other two police cruisers that had arrived and placed in the back seat.  Trooper McKenna then separately asked the same questions of the passenger, Benitez, and after receiving substantially similar responses, had Benitez escorted to the backseat of the other police cruiser where he remained separated from defendant.

After both defendant and Benitez were seated in police cruisers, Trooper McKenna and his detection dog searched defendant's vehicle.  The dog alerted to the area of the dashboard above the radio, an area identified to Trooper McKenna by the surveilling officers as a potential hide for the drug proceeds defendant was believed to be carrying.

Trooper McKenna then approached defendant, still seated in the police cruiser, and informed him that his dog had alerted to a "narcotic odor."  When asked, defendant denied having anything in the vehicle that might have caused the dog to alert.  Trooper McKenna then informed defendant that his vehicle would be towed

to a nearby police barracks so that police could conduct a more thorough search. McKenna told him again that he would be free to leave once the search was completed. Finally, McKenna gave him the option of walking to a nearby shopping mall and waiting there during the search or accompanying the officers to the police barracks. At the time, McKenna still had defendant's wallet, which he had taken at some point during the encounter. Defendant and his companion opted for the barracks and were transported there in separate cruisers.

At the police barracks, defendant and Benitez remained, unescorted, in the lobby while members of the joint drug task force searched for and recovered $49,600 in cash that had been hidden behind the dashboard and underneath the truck. At approximately 10:30 p.m., Trooper McKenna, alone, approached defendant, told him what the police had found and asked him about the currency. Defendant denied knowledge of it and claimed that it was not his money. Defendant accepted a receipt for the seized currency but refused to sign it.

At no point during any of the interactions that day was defendant given Miranda warnings or told that he was under arrest. Defendant now moves to suppress the stop of his vehicle and the fruits of the subsequent search, namely the $49,600 in United States currency, as well as all of his statements made to police during the course of the stop and search.

## II.  Search and Seizure

Defendant seeks suppression of the physical evidence recovered from the stop and search on the basis that Trooper McKenna, the officer who stopped the vehicle and ordered its search, lacked probable cause authorizing him to do so.

### A.    Automobile Searches and the Fellow Officer Rule

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  A warrantless search is per se unreasonable, "subject only to a few specifically established and well-delineated exceptions." Arizona v. Gant, 556 U.S. 332, 338 (2009) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)).  One such exception exists for searches of motor vehicles, which are permitted when the searching officer has probable cause to believe that the vehicle contains contraband or evidence of criminal activity.  United States v. Goncalves, 642 F.3d 245, 249 (1st Cir. 2011) (citing California v. Acevedo, 500 U.S. 565, 579 (1991)).  Probable cause to search a vehicle justifies a search of the entire vehicle, and, importantly, justifies seizing the vehicle and searching it after the fact. See United States v. Panitz, 907 F.2d 1267, 1272 (1st Cir. 1990) (finding warrantless search of vehicle "need not be conducted contemporaneously with the seizure" and is not limited "temporally [or] spatially").

Probable cause exists when, given all the circumstances, there is a fair probability that contraband or evidence will be found in the place described. United States v. Moore, 790 F.2d 13, 15 (1st Cir. 1986). Where the officer conducting the search of a vehicle possesses specific facts satisfying the probable cause standard at the time of the search, the search must be upheld. See, e.g. United States v. Infante-Ruiz, 13 F.3d 498, 502 (1st Cir. 1994) (upholding search).

Under the "fellow-officer" rule, law enforcement officials who are cooperating in an investigation are also "entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime." United States v. Meade, 110 F.3d 190, 193-94 (1st Cir. 1997). When a law enforcement officer with information amounting to probable cause directs an officer who lacks the knowledge to make an arrest, courts impute to the arresting officer the directing officer's knowledge. See id. at 193. Under an important corollary, the court may presume that the "collective knowledge" of all participating officers may be presumed to have been communicated to the directing officer. See United States v. Bashorun, 225 F.3d 9, 13 (1st Cir. 2000) (noting the Court in Meade bypassed the "controversial question" of whether government must prove directing officer's knowledge and declining to decide it).

## B.   Application

As an initial matter, the officers cooperating on the joint task force collectively made observations that gave them probable cause to believe that on February 17, 2012, the date of the stop, defendant's vehicle contained evidence of criminal activity, namely, currency to be transported and eventually used for the purchase of drugs.  Two days prior to the stop, officers assigned to the task force believed, based upon intercepted phone calls, that Gomez would pick up currency from Andujar and deliver it to another co-conspirator to be transported out of state.  Later that same day, another officer personally observed Gomez collect a bag believed to contain currency.  On the day of the stop, two other task force officers observed defendant taking the same bag from Gomez and, later, stashing it in the dashboard of his vehicle.  Merely observing Benitez stash a bag in the undercarriage of defendant's truck, on its own, raised suspicion. When coupled with the task force's knowledge of the Andujar DTO, defendant's association with its members and telephone calls suggesting an imminent delivery of drug proceeds, the collective information established probable cause to believe that defendant was transporting drug proceeds out of state and that his vehicle contained evidence of a drug conspiracy.

Accordingly, although Trooper McKenna was not a member of the joint task force, he conducted the stop and search at the

direction of Sergeant Kane, who was a participant.  Presuming
that the other task force members communicated their collective
knowledge of these facts to him, Sergeant Kane, who instructed
McKenna to make the stop, clearly had knowledge of facts
sufficient to give him probable cause to stop and search
defendant's vehicle.  Even without the benefit of the collective
knowledge presumption, Sergeant Kane's specific instructions
strongly suggest that he was apprised of the underlying facts
constituting probable cause: he informed Trooper McKenna of the
description of defendant's vehicle and, more specifically, that
1) defendant's vehicle was connected to a lengthy federal
narcotics investigation, 2) officers had observed defendant
placing what were believed to be drug proceeds in hides behind
the dashboard and underneath his vehicle earlier that day, and 3)
the vehicle was expected to depart the Commonwealth that night.

Armed with probable cause to believe that defendant's
vehicle contained contraband, the automobile exception permitted
Trooper McKenna to stop and search the vehicle.  Those facts also
permitted Trooper McKenna to have the vehicle towed and searched
at the police barracks because the officers expected the
contraband to be secreted within areas of the vehicle not readily
accessible at road side.  See Panitz, 907 F.2d at 1272.  While not
necessary to create probable cause for the search, the narcotic
detection dog's positive alert further supported the need to tow

defendant's vehicle and shows that the thorough search of the truck's interior by police was reasonable in scope and related to their suspicion regarding the vehicle's contents.

Because the stop and the two searches were conducted upon probable cause, the Court need not determine whether defendant consented to the searches. Defendant's motion to suppress the stop and both searches and the physical fruits thereof will therefore be denied.

## III. Inculpatory Statements

Defendant raises several arguments in support of his motion to suppress the statements referenced above: (1) he was, in fact, under arrest during the course of the stop when police ordered him out of the vehicle, allegedly handcuffed him, and eventually transported him to a police barracks and (2) any statements that he made, once de facto arrested, were the product of "custodial interrogation" and must be suppressed.

### A. Motion to Strike Defendant's Affidavit

In March, 2013 the Court held a suppression hearing limited in scope to defendant's motion to suppress his statements. Trooper McKenna was the sole witness; the defendant elected not to testify. The government thereafter moved to strike defendant's affidavit submitted in support of his motions to suppress pursuant to United States v. Baskin, 424 F.3d 1 (1st Cir. 2005), a case in which the First Circuit affirmed the

district court's decision to strike defendant's testimony at a suppression hearing where he refused to answer questions on cross-examination.

The affidavit in question, while generally consistent with the sequence of events as described by Trooper McKenna, asserts two material distinctions: first, defendant claims that he was handcuffed in the back of a police cruiser while Trooper McKenna searched his vehicle and while being transported to the police station; and second, he claims that officers instructed him not to leave the police barracks while his vehicle was being searched. With respect to the first claim, Trooper McKenna testified that he was not sure whether another officer had handcuffed defendant and with respect to the second, McKenna denied that he told defendant he was not free to leave.

Although permitted to do so, this Court declines to strike defendant's affidavit. Because the Court credits much of Trooper McKenna's testimony, including the aspects disputed by the affidavit, striking the affidavit is unnecessary. See United States v. Ramos, 591 F. Supp. 2d 93, 113-114 (D. Mass. 2008) (Wolf, J.) (discrediting affidavit because police testimony was credible and defendant's statements were not subject to cross examination). The Court finds, however, that defendant failed to prove that he was handcuffed or that he was instructed not to leave the police barracks.

B.    **Custody Absent Formal Arrest**

It is bedrock law that a person questioned by law
enforcement officers after being taken into custody or otherwise
deprived of his freedom of action in any significant way must
first be given Miranda warnings. United States v. Hughes, 640
F.3d 428, 434 (1st Cir. 2011) (quotations omitted).  In the
instant case, there is little doubt that defendant's statements
were made in response to questions from police officers and could
therefore be interpreted as elicited by "interrogation." See
United States v. McCarty, 475 F.3d 39, 45 (1st Cir. 2007) (noting
interrogation constitutes questioning other than those attendant
to custody that police "should know are reasonably likely to
elicit an incriminating response").  Accordingly, the Court
focuses its inquiry on whether defendant was "in custody."

In the absence of a formal arrest, the court should engage
in a two step process in order to determine whether defendant was
in "custody": 1) ascertain the circumstances surrounding the
arrest, and 2) determine whether those circumstances, when viewed
objectively, constitute a "restraint on freedom of movement of
the degree associated with a formal arrest." Hughes, 640 F.3d at
435 (citations omitted).

With regard to the second step, courts in the First Circuit
examine four factors, among others: (1) whether the suspect was
questioned in familiar or at least neutral surroundings, (2) the

number of law enforcement officers present at the scene, (3) the degree of physical restraint placed upon the suspect and (4) the duration and character of the interrogation. Id. (quotations omitted). The determination of whether custody exists depends upon the objective circumstances of the interrogation, not on the "subjective views harbored by either the interrogating officers or the person being questioned." Id. (internal quotation and citation omitted).

C.   Application

Defendant made statements to Trooper McKenna at several intervals during the stop and search of his vehicle. Defendant's responses to Trooper McKenna's initial inquiry, regarding the purpose of his travel and the presence of contraband in his car made after he had been asked to step outside of his vehicle, were not made while in custody but rather were made attendant to a Terry stop for which Miranda warnings are not required. See United States v. Teemer, 394 F.3d 59, 66 (1st Cir. 2005) (finding that even though person may not reasonably be free to leave, Miranda warnings not required unless roadside stop becomes coercive). Although defendant was not cited for a traffic violation and Trooper McKenna admitted that the stop was not "routine," his subjective motivations are irrelevant to the inquiry. See Hughes, 640 F.3d at 435. Moreover, although two other officers were nearby, only Trooper McKenna questioned

defendant.  Defendant was not therefore physically restrained and the brief questioning occurred in the somewhat neutral setting at roadside.

Defendant's statements after Trooper McKenna conducted a search of the vehicle are a different kettle of fish.  When Trooper McKenna asked defendant about the presence of illegal narcotics in his car, Cabral was seated in the back of a police cruiser where at least one other officer was present.  By that time, Trooper McKenna was also in possession of defendant's wallet.  Outnumbered and confined in the police cruiser, defendant was restrained to a degree commensurate with arrest and should have been given Miranda warnings before being questioned further.  Cf. Teemer, 394 F.3d at 66 (Miranda warnings were not required even after suspicion began to develop because suspect had not been handcuffed, ordered into a police car, or otherwise subjected to physical restraints).

The implicit restraint continued while defendant waited for the police to complete their search of his vehicle at the police barracks.  In that regard, the significance of defendant's conveyance to the police barracks cannot be overstated.  Pre-arrest questioning at a police station is not deemed custodial where the suspect comes to the police station voluntarily and there is no restriction on his freedom.  United States v. Quinn, 815 F.2d 153, 160 (1st Cir. 1987) (citing California v. Beheler,

463 U.S. 1121, 1125 (1983)). By contrast, where a suspect is transported to the police station involuntarily a de facto arrest occurs. See Hayes v. Florida, 470 U.S. 811, 816 (1985) (finding suspect de facto arrested, for Fourth Amendment purposes, when taken to station for fingerprinting under threat of arrest).

Although defendant here was not transported to the police barracks under arrest, an unexpressed threat of arrest was implied and it cannot be said that he came to the barracks voluntarily and without any restriction on his freedom. Defendant was from out-of-state and was stopped en route to Illinois. At the time that he "chose" between waiting out the search of his vehicle at a local mall and accompanying the police to the barracks, defendant was seated in a police cruiser parked near an interstate exit ramp. The police possessed his wallet and his only means of transportation.

By contrast, the suspects in the Supreme Court cases relied upon by the government were not so constrained when each agreed to speak with police at the station. In California v. Beheler, the suspect contacted police to report a homicide. 463 U.S. at 1122. Beheler eventually told police that an acquaintance had shot the victim, and after permitting the police to search his backyard for the gun, later that evening he agreed to accompany the police back to the station for questioning. Id. He was interviewed for 30 minutes and never given Miranda warnings. Id.

-15-

Noting that neither the fact that the defendant was a suspect nor that the questioning occurred at the station house required <u>Miranda</u> warnings, the Supreme Court found none were required. <u>See id.</u> at 1124 (citing <u>Oregon</u> v. <u>Mathiason</u>, 429 U.S. 492, 495 (1977)).

In <u>Oregon</u> v. <u>Mathiason</u>, a police officer investigating a burglary left his card at Mathiason's apartment with a note asking him to call because he wanted to "discuss something" with defendant. 429 U.S. at 493.  Mathiason called the officer on the following day, and after stating that he had no preference as to meeting location, Mathiason agreed to meet the officer at a nearby police station. <u>Id.</u>  The officer told Mathiason that he was not under arrest and advised him that the truthfulness of his statements regarding the burglary could be considered by a prosecutor or judge. <u>Id.</u>  Mathiason ultimately confessed. Because Mathiason had come voluntarily to the police station and his freedom to depart was unrestricted, the Supreme Court found that he was not in custody and therefore no <u>Miranda</u> warnings were required prior to his interview. <u>Id.</u> at 495.

Unlike Messrs. Beheler and Mathiason, defendant did not come to the police barracks voluntarily.  The circumstances under which he arrived were inherently coercive and are not offset by the fact that, when Trooper McKenna approached defendant, he did so alone, the interrogation was limited and defendant was not

handcuffed.  Even if police were justified in seizing defendant's vehicle and assiduous about informing defendant he was not under arrest, they were required to advise him of his <u>Miranda</u> rights before asking questions likely to elicit incriminating responses.

Defendant's motion to suppress will therefore be allowed insofar as it relates to his statements made while seated in the police cruiser at the roadside and while at the police barracks. In all other respects, defendant's motion will be denied.

### ORDER

In accordance with the foregoing, and as previously ruled, in part,

1) defendant's motion to suppress the stop and search (Docket No. 84) is **DENIED,**

2) the government's motion to strike defendant's affidavit (Docket No. 110) is **DENIED,** and

3) defendant's motion to suppress his statements (Docket No. 85) is, with respect to those statements made while seated in the police cruiser and in the police barracks, **ALLOWED,** but in all other respects, **DENIED.**

**So ordered.**

Nathaniel M. Gorton
United States District Judge

Dated April 16 , 2013